Robert G. Clyne
Lauren E. Komsa
HILL RIVKINS LLP
45 Broadway, Suite 1500
New York, New York 10006-3739
(212) 669-0600

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BUNGE S.A.

                   Plaintiff,

-against-

GLORY WEALTH SHIPPING PTE LTD.

                   Defendant.

Index No.   CN 6620

COMPLAINT

     Plaintiff, BUNGE, S.A. (hereinafter "Bunge"), by and through its attorneys, Hill Rivkins LLP, for its Verified Complaint against Defendant, GLORY WEALTH SHIPPING PTE LTD. (hereinafter "Glory Wealth"), alleges upon information and belief as follows:

    1.    This is a case of admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333, and is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure in that it involves a claim for breaches of a maritime Charterparty contract. Alternately, this court has jurisdiction over this case under 28 U.S.C § 1331 as an action for recognition and enforcement of a foreign arbitral award pursuant to 9 U.S.C § 207.

    2.    At and during all material times hereinafter mentioned, Plaintiff Bunge was and now is a foreign corporation with an office and place of business at Route de Florissant 13, P.O. Box 518 CH 1211, Geneva 12, Switzerland.

3.     At and during all material times hereinafter mentioned, Defendant Glory Wealth was and now is a foreign corporation with an office and place of business at 07-00, Suntec City, Tower II, 9, Temasek Boulevard, Singapore, 038989.

## FACTUAL BACKGROUND

4.     On October 30, 2007, Plaintiff, as Owner and Defendant, as Charterer, entered into a Chartering agreement ("the Charterparty") with respect to the M/V DIMITRIUS APESAKIS, for minimum 24 months to maximum 25.5 months period time charter at US$66,500 per day (less 5% commission).  A true and accurate certified copy of the Charterparty is attached hereto as Exhibit 1.

5.     On August 28, 2008, the vessel was delivered to Defendant.  Pursuant to the terms of the Charterparty, the earliest date that Defendant could lawfully re-deliver the vessel to Bunge was on August 28, 2010.

6.     On February 19, 2009, Defendant repudiated the Charterparty and the charter was prematurely terminated 555 days early.

7.     As a result of the vessel's early redelivery, Plaintiff sought damages from Defendant for the difference between the contract and market rates at the time of the Defendant's repudiation. Specifically, on February 24, 2009, Plaintiff submitted a claim to Defendant for damages in the amount of $27,685,353.71, based upon an available market rate of $16,000 per day.

8.     Defendant rejected this claim and refused to reimburse Plaintiff for damages resulting from the premature termination of the Charterparty.

9.     Thereafter, Plaintiff commenced an arbitration proceeding in London, pursuant to the terms of the Charterparty, seeking damages in the sum of $26,626,125, which represented the difference between the Charterparty rate and the market rate for 555 days.

10.    Pursuant to the arbitration agreement in the Charterparty, three arbitrators were appointed to hear and decide the dispute, pursuant to the 2006 Rules of the London Maritime Arbitrators Association.

11.    On April 20, 2011, the arbitrators held an oral hearing, in which both sides presented expert testimony.

12.    On May 26, 2011, the arbitration panel issued a unanimous award, awarding Plaintiff $26,222,897.50 in damages.   A true and accurate certified copy of the original arbitration award is attached hereto as Exhibit 2.

13.    By reason of the premises, Plaintiff has sustained damages as nearly as same can now be estimated, no part of which has been paid, although duly demanded, in the total amount of $26,222,897.50.

14.    This action is brought to obtain recognition and enforcement of a foreign arbitral award, rendered in England in favor of Plaintiff and against Defendant.

15.    This action is further brought to attach Defendant's property, now located in the Southern District of New York at HSBC and/or Wells Fargo, pursuant to Rule B of the Supplemental Rules of Certain Admiralty and maritime Claims of the Federal Rules of Civil Procedure.

### Request for Rule B Attachment

16.    After due investigation, Defendant Glory Wealth cannot be "found" in this District for purposes of and as delineated in Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.  Plaintiff is informed that Defendant

has assets within this District, including but not limited to, cash, funds, escrow funds, and credits at the following financial institutions located in the Southern District of New York: HSBC and/or Wells Fargo.

17.    For the purpose of obtaining personal jurisdiction over Defendant and securing Plaintiff's claim as described above, Plaintiff seeks an order from this Court directing the Clerk of the Court to issue process of maritime attachment and garnishment pursuant to Rule B of the Federal Rules of Civil Procedure Supplemental Rules for Certain Admiralty and Maritime Claims and the Federal Arbitration Act, 9 U.S.C § 201 et seq., restraining and attaching any assets, cash, funds or credits belonging to Defendant located at HSBC and/or Wells Fargo, upon whom a copy of the Process of Maritime Attachment and Garnishment will be served.

W H E R E F O R E, plaintiffs pray:

1.    That process in due form of law according to the practice of this Court may issue against Defendant, citing it to appear and answer the foregoing, failing which, a default will be taken against it for the principal amount of the claim, plus interest, costs and attorneys' fees;

2.    That if Defendant cannot be found within this District, that a Writ of Maritime Attachment and Garnishment issue pursuant to Rule B, attaching and restraining all assets of Defendant, including but not limited to cash, funds, escrow funds, credits, accounts, letters of credit, freights, sub-freights, charter hire, sub-charter hire, and other property of the Defendant which may be located or deposited at HSBC and/or Wells Fargo.

3.      That this Court retain jurisdiction over this matter for any subsequent enforcement action as may be necessary; and

4.      For such other, further, and different relief as the Court may deem just and proper in the premises.


Dated:  New York, New York
        September 22, 2011


                        HILL RIVKINS LLP
                        Attorneys for Plaintiffs


                By: _____
                        Lauren E. Komsa
                        45 Broadway, Suite 1500
                        New York, New York 10006
                        (212) 669-0600

## VERIFICATION

I, Lauren E. Komsa, hereby affirm as follows:

1. I am a member of the firm Hill Rivkins LLP, attorneys for plaintiff Bunge, S.A. I have prepared and read the foregoing Verified Complaint and know the contents thereof and, the same is true to the best of my knowledge, information and belief.

2. The sources of my knowledge, information and belief are documents provided by our clients and our discussions with them.

3. As plaintiff is a foreign corporations residing outside the Southern District of New York, this verification is made by me as counsel of record.

I hereby affirm that the foregoing statements are true and correct.

Dated: New York, New York
       September 22, 2011

Lauren E. Komsa

# EXHIBIT 1



## Bunge SA, Geneva

M/V "DIMITRIS APESAKIS"

Charterparty dated October 30th, 2007

between Bunge SA as disponent owner and Glory Wealth Shipping Pte Ltd as charterer

I, Laurent Rupp, am the financial controller of the Freight Product Line at Bunge SA and do hereby certify that the attached is a true copy of the charter party agreement with arbitration clause dated 30th October 2007 between Bunge SA and Glory Wealth Shipping Pte Limited of Singapore.

Date

Laurent Rupp

# Time Charter

GOVERNMENT FORM

*Approved by the New York Produce Exchange*

November 6th 1913 - Amended October 20th, 1921, August 6th, 1931, October 3rd, 1946.

1 **This Charter Party** made and concluded in *Lausanne* ............................................. *30th day of October* ............... 19 *2007*

2 Between Messrs. *Bunge S.A., Geneva as Disponent* .............................................................................................................

3 Owners of the good *Cyprus flag* - Steamship/Motorship *"DIMITRIS APESAKIS" - For Vessel's Description see Clause 29 -* of ........

4 ........................................ of ........................... tons gross register, and .......................... tons net register, having engines of .......................... indicated horse power

5 .......................... and with hull, machinery and equipment in a thoroughly efficient state, and classed ...........................................................

6 .......................... of ........................ tons of .......................... cubic feet bale capacity, and abreast ...................... tons of 2240 lbs.,

7 deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one-and-one-half percent of ship's deadweight capacity,

8 allowing a minimum of fifty tons) on a draft of ...................... feet ...................... inches on .......................... Summer *salt water* freeboard, inclusive of permanent bunkers

9 which are of the capacity of about .......................... tons of fuel, and capable of steaming, fully laden, under good weather

10 conditions about .......................... knots on a consumption of about .......................... tons of best Welsh coal - best grade fuel oil - best grade Diesel oil,

11 now ..................................................................................................................................

12 .......................... and *Glory Wealth Shipping Limited* .......................... Charterers of the City of *Singapore* ...........

13 **Witnesseth,** That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

14 about *Minimum 24 months / maximum 25.5 months period Time-Charter in Charterers' option, trading via safe anchorage(s),*

15 *safe berth(s), safe port(s), always within Institute Warranty Limits, always afloat except N.A.A.B.S.A. (Not Always Afloat But*

16 *Safely Aground) as per Nype Clause 6 herebelow where customary for such type of vessel -* within below mentioned trading limits.

Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for

the fulfilment of this Charter Party. *Acceptance of delivery by Charterers shall not constitute any waiver of Owners' obligation under*

*this Charter-Party.*

18 Vessel to be placed at the disposal of the Charterers, at *on dropping dockyard pilot Tsuneishi Shipyard Zhoushan China at any time*

19 *day, night, Sundays and holidays included -*

in such dock or at such wharf or place (where she may safely lie, always afloat at all times of tide, except on dropping as provided in clause 21 as

the Charterers may direct. If such dock, wharf or place is not available, time to count as provided for in clause 20-) Vessel on her delivery to be

ready to receive the *permitted* cargo with clean swept holds and tight, staunch, strong and in every way fitted for the service, having water ballast, winches and

donkey boiler with sufficient steam power, or if not equipped with donkey-boiler, then other power sufficient to run all the winches at one and the same

time and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage, to be employed, in carrying *only* lawful merchan-

dise *as permitted under this Charter-Party* including petroleum or its products, in proper containers, excluding

vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small quantity on deck at their risk,

all necessary fittings and other requirements to be for account of Charterers, in such lawful trades, between safe port and/or ports in British North

America ...........................................................................................................................

Mexico ...........................................................................................................................

and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between

October 31st and May 15th, Hudson Bay and all unsafe ports, also excluding, when out of season, White Sea, Black Sea and the Baltic,

..............................................................................................................................

to the Charterers at their hire as shall direct, on the following conditions.

**1** That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew; shall pay for the

insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her class and keep

the vessel in a thoroughly efficient state in hull, machinery and equipment for and during the service *with all inspection certificates necessary to*

*comply with current official requirements at ports*

**2** That the Charterers shall provide and pay for all the fuel except *lubricating oil* as otherwise agreed, Port Charges, *Canal Dues / Tolls*

*(including Bosphorus / Dardanelles, compulsory / customary* Pilotages *(including Skaw, Bosphorus / Dardanelles and Magellan,*

*if required by Master)*, Agencies, Commissions,

Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into

a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of

illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this

charter to be for Charterers account. All other fumigations to be for Charterers account unless such fumigations are due to cargoes carried or ports

of call while on hire under this charter.

**3** Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade *including any additional ropes*

*required by Port Authorities when trading to West Coast South American ports* or unusual cargo, but

Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards

for dunnage, they making good any damage thereto.

7. ~~That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on board the vessel at the current prices at the respective ports; the vessel to be delivered with not less than ............ tons and not more than ............ tons and not less than ............ tons and not more than ............~~

8. That the Charterers shall pay for the use and hire of the said Vessel at the rate of *See Clause 74 - daily including overtime* ~~United States Currency per ton on vessel's total deadweight carrying capacity, including bunkers and stores, on~~ ~~summer freeboard, per Calendar Month,~~ commencing on and from the day of her delivery, as aforesaid, and at and after the same rate for any part of a *day;* month, hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary wear and tear excepted, to the Owners (unless lost) at *on dropping last outward sea pilot one safe port or passing one of following ranges : Skaw / full Mediterranean range - Colombo / Japan range - Boston / Bahia Blanca range - Aden / Passing Muscat Outbound - Maputo / Capetown at any time day, night, Sundays and holidays included -* unless otherwise mutually agreed. Charterers are to give Owners not less than *30 days* approximate

notice of vessel's expected date of re-delivery, *and 10/7/5/3/2/1 day(s) definite notice of redelivery port.* ~~and probable port~~ *Acceptance for redelivery shall not constitute any waiver of Charterers' obligations arising out of this Charter-Party.*

9. Payment of said hire to be made in New York, in cash in United States Currency, *every 15 days* ~~semi-monthly in advance,~~ and for the last *15 days* ~~half month~~ ...............

part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the hire or bank guarantee, or on any *fundamental/intentional* breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Charterers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. ~~Time to count from 1 a.m. on the working day following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they to have the privilege of using vessel at once, such time used to count as hire.~~

Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject to 2 1/2% commission, and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application of such advances. *See Clause 43 -*

10. That the cargo or cargoes be laden and/or discharged in any dock or at any wharf or place that Charterers or their Agents may direct, provided the vessel can safely lie always afloat at any time of tide, except at such places *in East Coast South America only* where it is customary for vessels to vessels to settle.

~~11.~~ ............

~~12.~~ That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew, tackle, apparel, furniture, provisions, stores and fuel. Charterers have the privilege of passengers as far as accommodations allow, charterers paying Owners ............ per day per passenger for accommodations and meals. However, it is agreed that at such time any time extra expenses are incurred in the consolidation of the carriage of passengers, Charterers are to bear such risk and expense. *No passengers allowed.*

13. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and agency; and charterers are to load, stow, and trim, *tally, secure and discharge* the cargo at their *time, risk and* expense under the supervision of the Captain, who is to sign Bills of Lading for cargo as presented in conformity with Mate's or Tally Clerk's receipts. *All Bill(s) of Lading issued shall be without prejudice to this Charter-Party (See Clause 84) - Master / Owners to remain ultimately responsible for vessel's seaworthiness.*

14. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

15. That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table. Charterers paying at the rate of *U.S.$ 7.50* per day Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally Clerks, Stevedore's foremen, etc., Charterers paying at the current rate per meal, for all such victualling *See Clause 72 -*

16. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Charterers, their Agents or Supercargo, when required, with a true *abstract* copy of daily Logs, showing the course of the vessel and distance run and the consumption of fuel.

17. That the Captain shall use diligence in caring for the ventilation of the cargo. *Vessel has natural ventilation only.*

18. ~~That the Charterers shall have the option of continuing this charter for a further period of ..............~~ ~~on giving written notice thereof to the Owners or their Agents ........ days previous to the expiration of the first named term, or any declared option.~~

19. That if required by Charterers, time not to commence before *00.01 hours local time 30th June, 2008* ~~and~~ should vessel not have given written notice of readiness on or before *24.00 hours local time on the 15th August, 2008* ~~but not later than 4 p.m.,~~ Charterers or their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness. *Hire to be calculated according to GMT.*

20. That in the event of the loss of time from deficiency *and/or default* of men or stores, fire, breakdown or damages to hull, machinery or equipment, grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost, and if upon the voyage the speed be reduced by defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence thereof, and all extra expenses shall be deducted from the hire *provided fully substantiated See Clause 88 -*

21. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas, Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the purpose of saving life and property.

17. That should any dispute arise between *the parties* ~~Owners and the Charterers~~, the matter in dispute *howsoever based*, shall be referred to, *to arbitrate before* three persons *in London* ~~or New York~~, *English Law to apply in both procedure and substance*, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial *shipping* men. *See below "Addition to Arbitration Clause".*

18. That the Owners shall have a lien upon all cargoes, and all sub-freights *and sub-hires* for any amounts due under this Charter including General Average contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the owners in the vessel.

19. That all demurrage and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and Crews proportion. General Average to be adjusted, stated and settled, according to Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of York-Antwerp Rules *1974 as amended 1990, English Law to apply / Hague Rules to apply. General Average / Arbitration in London,* ~~1924~~, at such part or place in the United States as may be selected by the carrier, and as to matters not provided for by these Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into United States money at the rate prevailing on the date monies and allowances for damage to cargo claimed in foreign currency shall be converted at the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in United States money.

In the event of accident, danger, damage or disaster, before or after the commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract or otherwise, the goods, the shippers and the consignees, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or ships belonged to strangers. *Hire is not to contribute to General Average.*

Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.

20. Fuel used by the vessel while off hire, also for cooking, condensing water, or for grates and ovens to be agreed to as to quantity, and the cost of replacing same, to be allowed by Owners. *Any off-hire claim to be submitted to Owners latest forty-five days after occurrence otherwise to be considered null and void.*

21. That as the vessel may be from time to time employed in tropical waters during the term of this Charter, she is to be docked at a convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, according from time of her painting and payment of the hire to be suspended until she is again in proper state for the service. *See Clause 105 -*

22. Owners to maintain the gear of the ship as fitted, providing gear (for all derricks capable of handling lifts up to three tons) also providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel *electric lights* lanterns and oil for night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers expense. The Charterers to have the use of any derricks on board the vessel.

23. Vessel to work night and day, if required by Charterers, and all winches to be at Charterers' disposal during loading and discharging. Steamer to provide one winchman per hatch to work winches, day and night, as required, Charterers agreeing to pay officers, engineers, watchmen, deck hands and donkeyman for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the use of the vessel's winches, power, crew from driving winches, shore Watchmen to be paid by Charterers. In the event of a disabled winch or winches or insufficient power to operate winches, Owners to pay for shore engine or engines, or otherwise to reduce the hire, if required, and pay any loss of time occasioned thereby.

24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels, etc." in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both of which are to be included in all bills of lading issued hereunder.

**U.S.A. Clause Paramount**

This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading be repugnant to said Act to any extent, such term shall be void to that extent, but no further.

**Both-to-Blame Collision Clause**

If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-carrying ship or her owners to the owners of said goods and set-off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or Carrier.

25. The vessel shall not be required to enter any ice bound port *nor to force / break ice, nor follow ice breaker*, or any port where lights or light-ships have been or are about to be withdrawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the port or to get out after having completed loading or discharging.

26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the navigation of the vessel, insurance, crew, and all other matters, same as when trading for their own account *Strikes from pilots / tughoats / linesmen and other similar services not to count against Owners.*

27. A commission of 2 4/2 *1.25* per cent is payable by the Vessel and Owners to *Messrs. Ifchor S.A. Lausanne -*

........................................................................................................................

on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter

28. An Address commission of 2 4/2 *3.75* per cent payable to *Charterers*. .................................. on the hire earned and paid under this Charter

*Clauses No 29 to 111 inclusive, as attached hereto, are deemed to be fully incorporated in this Charter-Party.*

*THE OWNERS :*                                     *THE CHARTERERS :*

This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship Brokers & Agents (U.S.A), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee of the user as appropriate and not by the author.

ADDITIONAL CLAUSES TO THE CHARTER-PARTY OF
M/V " DIMITRIS APESAKIS
DATED LAUSANNE, 30TH OCTOBER, 2007

**Clause 29**
Vessels Description :

**M/V " DIMITRIS APESAKIS "**
Flag Cyprus
Type Kamsarmax - bulk carrier with flash deck & forecastle
Port of registry : Limassol
Class NK, NS* (BC-A)(ESP),MNS*,mo strengthened for heavy cargo loading
where hold No 2, 4 & 6 may be empty
Built June / August 2008
Yard name Zhoushan and HN Tsuneishi Corporation, SS-033
Main engine Mitsui Man – B & W
Loa / LBP 228.99 meters / 222.00 meters
Breadth (moulded) 32.26 meters
Depth ( moulded) 20.03 meters
Summer DWT (preliminary) about 82,190 metric tons @ 14.429 meters
TPC  70.2 (full draft)
G.R.T. / N.R.T. about 43,158
Cargo hold & hatch coaming total about 97,186 cubic meters

Important Note : all figures are about !!!

Tank top strength : H 1/3/5  22.0.T/M2  , H 2/4  17 MT/M2

Tank capacity 100 pct ) in M3
Fuel (at 96% full capacity) 2'650 M3
Diesel oil (at 96% full capacity) 200 M3
Fresh water 480 M3
Ballast water 22,760 M3
Ballast water including No 4 h 37,185 M3
No 3 cargo hold 14,425 M3

Speed and consumption

Vessel entitles to use diesel oil at narrow/shallow busy water areas, and engine starting /
stopping and operating under a load of about 35% or less

Bunker specifications : IFO to be in accordance with ISO-8217/2005-RMG380 and MDO :
DMB or DMA only at sea

All figures are about and in good weather conditions, good weather conditions are
defined as wind force up to 4 at the Beaufort Scale and Douglas Sea State up to 3, not
against currents and no negative influence of swell.

| Speed | IFO (380 CST) | MDO |
|---|---|---|
| Normal ballast | about 14.0 | about 35 metric tons |
| Laden | about 13.5 | about 36.5 metric tons |

In port
Idle                                              Working
2,5 MT IFO (380 CST) + 0.2 MT (MDO)    2,8 MT IFO (380 CST) + 0.5 MT (MDO)

M/V " DIMITRIS APESAKIS " – C/P DATED 30.10.2007

Additional information

Australian ladders :  Fitted in all holds
Ventilation :         Natural
Constants :           about 300 metric tons excluding Fresh Water

" Important Notice "
"It is understood that all figures, and technical information in this description are on about basis, without guarantee and subject to ship builders reconfirmation. Full description shall be provided to Charterers when same is made available to Owners by the shipyard." Speed / consumption final figures to be determined during her maiden ballast and laden voyages".

Disponent Owners Bunge S.A. hereby guarantee that they will pass to Messrs. Glory Wealth the same speed and consumption figures they will receive from Head Owners, once the preliminary figures appearing in actual description will be updated.

Charterers standard Questionnaire shall be filled to the extent of the information Owners already have for the vessel. the questionnaire to be duly filled when owners shall have all the details of the vessel.

## Clause 30
### Notices
Charterers are to contact Master directly with voyage instructions etc.

## Clause 31
Deleted.

## Clause 32
The Owners represent and warrant that:

a)      The vessel is not owned or controlled by Haiti, Libya, Cuba, North Korea, Vietnam or Iraq or nationals thereof, is not registered under the Laws thereof and is not Chartered to or crewed by any nationals thereof.

b)      The vessel is not engaged in trade with Cuba (ie. not carrying goods or passengers to or from Cuba or Cuban national has an interest). The Owners acknowledge that the foregoing representations and warranties are of a continuing nature and Owners agree to indemnify and hold harmless Charterers for all costs, losses and liabilities arising from any breach of these representations and warranties.

## Clause 33
Owners warrant on delivery that vessel's hatch covers are weathertight to Classification Society Regulations.

## Clause 34
### Bunker Clause
Bunkers on delivery about 1'000 metric tons IFO and about 70 metric tons MDO.

Bunkers on redelivery about same quantities as on delivery.

Same prices both ends, according to Suppliers' prices invoiced to Owners.

M/V " DIMITRIS APESAKIS " - C/P DATED 30.10.2007

Charterers' option to bunker the vessel prior to delivery provided not interfering with Owners' operations.

Owners' option to bunker vessel prior to redelivery at last discharging port or Charterers' bunkering port, provided same does not interfere with Charterers' operations and always at Owners' time and expense.

Charterers have the right to deduct bunkers on redelivery from the last/hire payment(s).

Bunkers supplied during the currency of this Charter to conform to RMG 35 specifications with maximum viscosity 380 CST at 50 degrees centigrade for IFO residual fuel oil and DMB or DMA only specifications for distillate diesel oil, all of which to be in strict accordance with the ISO 8217:1996 (E) standard. Furthermore, all bunker grades to be of a homogeneous blend containing no by-products of lubricating oils, chemicals or any other waste substance(s).

Should Charterers be unable to supply the correct grade of fuel or diesel oil, they must give Owners adequate notice of their proposed/alternative supply and provide them with full specification of their intended supply for Owners' approval/acceptance. Charterers to give Owners advance notice of the name of their supplier.

Owners have the right to bunker the vessel for their own account at Charterers' last bunker port or during discharge prior to redelivery providing such bunkering arrangement does not interfere with Charterers' operation.

The estimated value of bunkers on redelivery to be deemed an advance against hire and shall not be subject to any commission.

**Clause 35**
Vessel to be delivered with valid Deratization Certificate on board, and if this does not cover the whole period of the Time Charter, then fumigation is necessary, cost of same and detention to be for Owners' account.

**Clause 36**
**Trading Exclusions**
Vessel to be employed in lawful trades for the carriage of lawful merchandise only via safe and good ports / berths / anchorages always afloat, always within Institute Warranty Limits excluding : Israel and Israeli controlled territories, Libya including Gulf of Sidra / Sirte, Algeria, Turkey, Turkish occupied Cyprus, Georgia including Abkhazia, Adriatic (but Italy allowed, as well as Koper, Rijeka, Bakar, Plomin), Somalia, Iraq, North Korea, CIS Pacific ports, North Caledonia, North and South Yemen, Papua, New Guinea, Sierra Leone, Sri Lanka, Nigeria, Kampuchea, Nicaragua, Bangladesh, Orinoco River, Chile, Cuba, Colombia, Haiti, Liberia, Zaire, Cambodia, Ethiopia, Eritrea, Angola including Cabinda and all the countries which are or may be come, during the currency of this Charter-Party, prohibited by the United Nations.

In case vessel will trade in war or warlike zone then Baltime 1939 (A,B,C,D,E,F) War Risk Clause to apply.

Vessel is not allowed to trade directly between China and Taiwan or vice versa.

**Clause 37**
Owners undertake the costs of fresh water. Expenses for domestic garbage removal are always for their account, unless compulsory in which case the cost of garbage removal in accordance with normal port charges is for Charterers' account.

- 3 -

M/V " DIMITRIS APESAKIS " - C/P DATED 30.10.2007

Charterers to supply on their account necessary fresh water at discharge ports as requested by Master for holds cleaning purposes.

### Clause 38
Charterers have the privilege of using suitable bulldozers with conventional rubber wheels when working on tank top in holds at their risks and expenses, according to vessel's tank-top strengths and to Master's satisfaction, which not to be unreasonably withheld. Vessel shall be suitable for grab discharge and no cargo is to be loaded in places inaccessible to grab discharge, or in deep-tanks, unless specifically instructed to the contrary by Charterers or their representatives.

### Clause 39
### Cargo Exclusions
All dangerous, hazardous, injurious, corrosive, inflammable cargoes / goods / commodities as listed in the latest IMO DG Code and/or any subsequent modifications / amendments thereof.

Additional cargoes excluded : concentrates (but iron ore concentrates are allowed), direct reduced iron ore, hot iron briquettes, ferro-silicone, sulphur, iron briquettes, TNT, dynamite, salt, salt petre, rock salt, sponge iron, acids, calcium carbide / chloride / hypochlorite, hydrochloride, ammonium nitrate / sulfate / sulphide, naphtha, dangerous chemicals, nuclear fuel, tar / bitumen or any of their products, asphalt, pitch, creosoted goods, petroleum or its products, petroleum coke, petcoke, charcoal, all types of scrap, metal turnings / shavings / borings, motor blocks, motor spirits, nuclear and/or radioactive materials or waste, isotopes, war materials, explosives, detonators, loaded bombs, black powder, bones, hooves, Mississippi coal, blasting caps, arms, ammunition, copra or its products, logs, toxic cargoes, devco coal, pond coal, livestock, animals, shavings, cotton, meat bone meal, hides of any kind, seeds, seed expellers, expellers of any kind, liquid substances, wheat milling pellets, copra pellets, sunflower seed expellers, fishmeal, gypsum, cement, cement clinker, borax, zinc ashes, asbestos, industrial waste, rice (bagged or bulk).

All cargoes to be loaded, stowed, trimmed, shipped and discharged as per IMO recommendations and according to Code of Safe Practice for Solid Bulk Cargoes (BC Code). Loading always in accordance with vessel's loading manual for the applicable cargo. California Block Stowage is excluded.

Maximum 2 cargoes of M.O.P. fertilizers grade are allowed.

Iron ore concentrates and blast furnace coke to be allowed. In case of loading blast furnace coke same to be loaded with cargo temperature not exceeding 30 Deg. Celcius.

### Clause 40
Charterers have the option of redelivering the vessel with unclean holds against paying Owners lumpsum U.S.$ 6'000.- (Six Thousand U.S. Dollars).

### Clause 41
This Charter Party shall have effect subject to the provisions of the following Clauses:

New Jason Clause, General Average Clause, Arbitration Clause, New Both-to-Blame Collision Clause, Conwartime 1993 War Risk Clauses, P. and I. Club Bunkering Clause, all of which are hereby agreed to be incorporated into this Charter Party. All Bills of Lading issued under this Charter Party shall validly and effectively incorporate all of the above.

M/V " DIMITRIS APESAKIS " - C/P DATED 30.10.2007

Clause 42
**Certificates / Vaccination**
Owners are obliged to deliver and keep the vessel, her crew and anything pertaining hereto supplied with up-to-date and complete official certificates and approvals and equipment and fittings, enabling the vessel and her crew to load, carry and discharge all cargoes permitted under this Charter Party and bunker within the trading limits of this Charter Party even where such certificates, approvals and equipment and fittings become necessary before or after the commencement of this Charter Party.

It is the responsibility of the Master and the Owners to arrange for any special vaccination required at ports of call and to keep on board corresponding valid certificates. Failing this, any time lost and all extra expenses to be for Owners' account and may be deducted from the hire.

Clause 43
When the hire is due and not received, the Owners, before exercising the option of withdrawing the vessel from the Charter Party will give Charterers 3 (three) banking days notice, and will not withdraw the vessel if the hire is paid within these 3 (three) days, also Owners are not entitled to claim interest provided delay in effecting the payment is not due to Charterers' default.

Clause 44
In case the estimated amount of bunkers on redelivery exceeds the amount of the last 15 (fifteen) days hire payment(s), the Charterers are then entitled to deduct such amount from the previous hire payment(s).

Clause 45
**Banking Details**
Banking details as follows :

JP Morgan, London
Account Number : 3658.6602
IBAN : GB22 CHAS 609242 3658 6602
Swift Code : CHASGB2L
London
United Kingdom
For credit of Bunge S.A. Geneva
Reference : M/V " Dimitris Apesakis " / Glory Wealth – C/P dated 30.10.2007

Clause 46
Should vessel put back whilst on voyage by reason of an accident or a breakdown, or in the event loss of time in port or at sea or deviation upon the course of the voyage caused by sickness or accident to the crew or any person on board the vessel (other than passengers and supercargo travelling, by request of the Charterers) or by reason of refusal of the Master/crew to perform their duties, the hire shall be suspended from the time of the inefficiency until vessel is again efficient in the same, position and voyage resumed there from, and all expense incurred, including bunkers consumed, during the period of suspended hire shall be for Owners' account.

Clause 47
The vessel is a self-trimming bulk carrier for loading, carrying up to a full and complete cargo of grain and sail without requiring shifting boards, bagging, strapping or securing. The vessel to have such grain loading certificate on board.

Clause 48

- 5 -

M/V " DIMITRIS APESAKIS " - C/P DATED 30.10.2007

Owners engage themselves to advise Charterers about feasibility of loading with empty / slack holds once grain loading manual will be in their hands.

## Clause 49
### Signing Bills of Lading
No through and also no Liner Bill(s) of Lading are permitted during this employment. Neither the Charterers nor their Agents shall permit the issue of any Bills of Lading, Waybill or other document evidencing a contract of carriage whether or not signed on behalf of the Owners or on the Charterers' behalf or on behalf of any sub Charterers incorporating, where not compulsorily applicable, the Hamburg Rules or any other legislation giving effect to the Hamburg Rules or any other legislation imposing liabilities in excess of Hague or Hague Visby Rules.

The Charterers shall indemnify the Owners against any liability, loss or damage which may result from a breach of the foregoing provisions of this Clause.

Master to sign Bills of Lading for cargo loaded as presented, in conformity with Mate's receipts. If required, the Master shall authorise Charterers and/ or their agents in writing (Owners' standard format / wording of such letter is to be used) to sign Bills of Lading on Owners' / Master's behalf in accordance with Mate's receipts.

## Clause 50
For instructions regarding loading port(s) and details of cargo, Master to apply to Glory Wealth Shipping Service Ltd., Quingdao.

Charterers are to provide with reasonable advance details of vessel's employment / voyages / ports of call to enable Owners to arrange timely various operation matters, provisions and supplies.

## Clause 51
Master to cable notices every two days to Glory Wealth Shipping Service Ltd., Quingdao by email to panamax@glorywealth.com.

## Clause 52
On delivery vessel's cargo holds and wing tanks (if applicable) to be thoroughly cleaned, dried, free from loose rust and previous cargo remainders, free from insects and odourless and in all respects ready to load a cargo of permitted cargo. If vessel fails Surveyor's inspection, vessel to be considered off-hire and all fuel consumed and extra related expenses for Owners' account.

## Clause 53
Vessel's equipment shall comply with official regulations of the country in which the vessel will be employed by Owners to ensure that vessel is at all times in possession of valid and up-to-date certificates of efficiency otherwise Charterers may suspend hire for the time thereby lost. Vessel has trim and stability book showing she is in compliance with National Cargo Bureau regulations, otherwise any additional trimming to be effected in Owners' time and expenses.

Grain loading shall be in accordance with SOLAS Carriage of Grain Regulations and vessel's grain loading and stability booklet.

## Clause 54
Charterers to have the benefit of the Owners' Protection and Indemnity Association so far as the rules permit. Charterers to have the benefit of any return insurance premium received by Owners from Underwriters (as and when received from Underwriters) by reason of the vessel being in port for a minimum period of 30 (thirty) days, provided

M/V " DIMITRIS APESAKIS " - C/P DATED 30.10.2007

vessel is on-hire. During the currency of this Charter Party Owners are to maintain full P. and I. cover for the vessel.

Charterers are covered for Charterers' liability insurance with U.K. P. and I. Club.

**Clause 55**
Deleted.

**Clause 56**
On-hire Full Condition and Bunker Survey to take place at first load port, off-hire Full Condition and Bunker Survey to take place at last discharge port. Each party to appoint and pay for their own surveyors. It is understood that the Master is to represent the Owners.

**Clause 57**
Should either before or after the vessel is delivered to Time Charterers, war operations break out between any two of the following Great Powers : U.S.A., United Kingdom, C.I.S., Communist China, Greece, seriously affecting the due fulfilment of this Time Charter, Owners and/or Charterers have the right to cancel this Charter Party the Charter Party shall be considered henceforward null and void. Also the Charter to be automatically terminated should the Government of the vessel's flag requisition the vessel.

**Clause 58**
No advances for vessel's expenses can be affected by Charterers and Owners are consequently fully responsible for putting Agents / Suppliers sufficiently in funds to avoid any delay to Charterers' operations. Charterers' Agents to attend to the vessel's husbandry matters at all ports of call but all relevant expenses to be for Owners' account. If required, Owners will appoint their own Agents to take care of Owners' matters.

It is understood that Charterers' Agents are arrange all formalities and file / submit ENOA on behalf of Master in accordance with relevant regulations ("ENOA" means Electronic Notice of Arrival).

**Clause 59**
The Charterers have the right to instruct Master to utilise the vessel's maximum water ballast capacity in order to bring down the vessel's height to get into position under loading and/or discharging appliances, however in conformity with freeboard, and safety regulations. Any delay due to ballast in cargo hold(s) to be for Charterers' account.

**Clause 60**
The stevedores shall be employed and paid by the Charterers, but this shall not relieve the Owners for proper stowage which shall be under the supervision of the Master, as regards seaworthiness.

**Clause 61**
The Charterers shall not be held responsible for loss sustained by the vessel through negligence or pilots who although employed by Charterers shall be deemed to be the servants of the Owners and under their instructions.

**Clause 62**
**International Tonnage Certificate**
Upon delivery the vessel shall have on board a valid International Tonnage Certificate for the duration of this Charter Party.
**Clause 63**

M/V " DIMITRIS APESAKIS " - C/P DATED 30.10.2007

Should the vessel remain off-hire for a continuous period of at least 30 (thirty) days, that Charterers have the option to cancel this Charter Party without further consequences to the parties. If at the time when vessel is in such off-hire, she has cargo on board, the cancellation of this Charter Party will apply on completion of the discharge of such cargo.

### Clause 64
Any taxes on hire earned under the Charter Party or its sub-hires, or sub-freights to be for Charterers' account, except for taxes if any levied on Charter Party hire by the nation of the vessel, flag or Ownership.

### Clause 65
### Boycott Clause
In the event of load of time arising from Government restrictions or boycott of the vessel by shore labour and/or trade unions and/or tug boats by reason of vessel's flag or the terms and conditions under which crew members are employed or by reason trading of this vessel or any other vessel under the same Ownership or operation or control, vessel to be placed off-hire for all time thereby lost.

### Clause 66
Cargo to be separated by vessel's natural compartments, otherwise separations to be at Charterers' costs, time and responsibility.

### Clause 67
Owners to supply Certificates as follows :

a)    Certificate from Lloyd's Register of Shipping or equivalent giving confirmation of vessel's Class as + 100 A.1. or equivalent.

b)    Certificate from Lloyd's Register of Shipping or equivalent giving declaration of vessel's year of build and age.

c)    Certificate of Protection and Indemnity Association Club, stating that the vessel is entered for full cover and shall remain entered for the duration of this Charter in a Protection and Indemnity Association and Head Owners' P. and I. Club is : GARD Arendal A/S.

### Clause 68
For the carriage of grain bulk vessel to have on board throughout this Charter period valid documents and certificates issued by the Classification Society and/or National Authority and accepted by the National Cargo Bureau, Ministry of Transport on the basis of SOLAS 1974 Regulations and latest amendments including dispensations for trimming long ends.

### Clause 69
### Fumigation
After vessel has passed inspection as per Charter Party the Charterers shall have the privilege to fumigate holds and/or cargo at their risk, time and expense.

### Clause 70
### Bill(s) of Lading at Discharge Port
Charterers to endeavour ensure Bill(s) of Lading arrive at discharge port in good time for vessel's arrival.

## M/V " DIMITRIS APESAKIS " - C/P DATED 30.10.2007

Should original Bill(s) of Lading not be available at discharge port in good time, then Owners / Master to discharge / release entire cargo against Charterers' single Letter of Indemnity in accordance with Owners' P. and I. Club wording, and signed by Charterers only, or signed by sub-Charterers together with Charterers' joint signature.

### Clause 71
The vessel consumes MDO when standby manoeuvring in/or off ports in canals, rivers and confined waters.

### Clause 72
Cables / victualling / entertainment expenses to be for Charterers' account for a lumpsum of U.S.$ 1'600.- (One Thousand Six Hundred U.S. Dollars) monthly or pro rata.

### Clause 73
Owners to keep Charterers advised on a daily basis of any change in the vessel's prospectus for completion of discharge / delivery, if it becomes apparent that, due to circumstances beyond Owners' control, it is likely that the vessel will miss the cancelling date, then Owners to advise Charterers of the same, and Charterers are to reply within 24 hours whether they maintain the vessel in accordance with her latest prospects. or cancel the vessel.

### Clause 74
Hire : U.S.$ 66'500.- (sixty-six Thousand and Five Hundred U.S. Dollars) Gross per day including overtime.

Hire payments to be made every 15 days in advance. First hire payment and value of bunkers on delivery to be paid on delivery payment.

### Clause 75
Any cargo claims to be settled in accordance with the latest NYPE Interclub Agreement.

The party having paid claim with Owners' or Charterers' agreement, as the case may be, shall submit to the other party supporting documents as soon as possible. However Charterers will not grant any time extension to cargo interests or settle any cargo claim without Owners prior written consent and approval.

### Clause 76
Gangway / watchman from crew, but if local regulation do not permit, or if compulsory, same to be for Charterers' account.

### Clause 77
Any extra insurance due to vessel's age, Class, flag, to be for Charterers' account.

### Clause 78
Financial responsibility in respect of pollution (all ships other than self-propelled tank vessel on non self-propelled tank vessel carrying more than 2,000 tons of persistent oil in bulk as cargo).

1)   Owners warrant that throughout the currency of this Charter they will provide the vessel with the following certificate :

a) Certificates issued pursuant to Section 311(p) of the U.S. Federal Water Pollution Control Act, as amended (Title 33 U.S. Code Section 1321(p) up to 26th June, 2000.

M/V " DIMITRIS APESAKIS " - C/P DATED 30.10.2007

b) Certificates issued pursuant to Section 1016(a) of the Oil Protection Act 1990, and Section 108(a) of the Comprehensive Environmental Response, Compensation and Liability Act 1980, as amended in accordance with Part 138 of Coast Guard Regulations 33 CFR, from date of delivery under this Charter Party so long as these can be obtained by the Owners from S.I.G.C.O.

2)    Notwithstanding anything whether printed or typed herein to the contrary.

a) Save as required for the compliance with paragraph (1) hereof, Owners shall not be required to establish or maintain financial security or responsibility in respect of all or other pollution damage to enable the vessel lawfully to enter, remain in or leave any port, place, territorial or contiguous waters or any country, state or territory in performance of this Charter Party.

b) Charterers shall indemnify Owners and hold themselves harmless in respect of any loss, damage, liability or expense (including but not limited to the costs of any delay incurred by the vessel as a result of any failure by the Charterers promptly to give alternative voyage orders) whatsoever and howsoever arising which Owners may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain or leave any port, place or waters, other than to the extent provided in paragraph 1) hereof.

c) Owners shall not be liable for any loss, damage, liability or expense whatsoever and howsoever arising which Charterers and/or the holders or any Bill of Lading issued pursuant to this Charter may sustain by reason of and requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or water, other then the extent provided in paragraph 1) hereof.

3)    Charterers warrant that the terms of this Clause will be incorporated effectively into any Bill of Lading issued pursuant to this Charter Party.

The Owners shall provide any documentation relating to the vessel that maybe required to permit the vessel to trade within the agreed trade limits, including, but not limited to Certificates of Financial Responsibility for Oil Pollution, provide such Oil Pollution Certificates are obtainable from Owners and P. and I. Club, valid International Tonnage Certificates, Suez and Panama Tonnage Certificates and valid Certificate of Registry.

Clause 79
Independent Weather Routing Company
The Charterers may supply an Independent Weather Routing Company to advise the Master during voyages specified by the Charterers, Owners may also appoint their own independent weather routing service. The Master shall comply with the reporting procedure of the routing service selected by the Charterers.

Evidence of weather conditions shall be taken from the vessel's deck logs and both Independent Weather Routing Companies Reports. In the event of a consistent discrepancy between the deck logs and the Charterers' Independent Weather Routing Company's report, both independent weather routing service reports and vessel's logs are to be given equal consideration for the purposes of determining weather encountered. However, it is understood that the actual route taken is always at Master's discretion. Any performance evaluation is to be carried out on completion of the voyage and upon receipt of all the log abstracts and the P.E.C.A. reports of both parties' Independent Weather Routing Service Companies.

M/V " DIMITRIS APESAKIS " – C/P DATED 30.10.2007

## Clause 80

Should any damage be caused to the vessel or her fittings, by the Charterers or their stevedores, the Master and/or the Owners shall do the following:

1) Give written notice to the Charterers or their supercargo or Agents of full particulars of the damage caused and the party allegedly responsible for the damage. Such notice to be given no later than twenty-four (24) hours after damage, except if hidden damages has occurred, but in case of hidden damage latest on completion of final discharge latest 24 hours after completion of discharge.

2) Give written notice to the party allegedly responsible, giving full particulars of the damage and its alleged cause, and obtain the written acknowledgement of liability from such party, or failing that the acknowledgement or receipt of such notice, if possible. Such notice to be given prior to vessel's sailing from the port.

When feasible, immediately arrange in conjunction with Charterers' agents or Supercargo the damage to be surveyed and an estimate of the repair costs given. It is expressly agreed and understood by Owners that the purpose of compliance of Owners/Master obligation in this Clause to preserve the Charterers' right of recourse against the party allegedly responsible.   Provided vessel is in seaworthy condition, Charterers may redeliver vessel without repairing stevedore or other damage and the outstanding damages are to be estimated by the joint surveyor if not already estimated. Charterers to settle either the estimated cost of repair as per survey report or the actual cost of repair to be carried out at a later date when vessel dry-docks as opted by Owners.

Damages which effect vessel's seaworthiness or cargo worthiness are to be repaired immediately by the Charterers at their time and expense.

Owners and/or Master will endeavour to comply with part one of this Clause, but Charterers remain ultimately responsible.

## Clause 81

Laycan in local time, hire to be calculated in Greenwich Meantime.

## Clause 82
## U.S. Anti Drug Abuse Act 1986 Clause for Time Charters

a) In pursuance of the provisions of the U.S. Anti Drug Abuse Act 1986, or any re-enactment thereof; the Charterers warrant to exercise the highest degree of care and diligence in preventing unmanifested narcotic drugs and/or marijuana to be loaded or concealed on board the vessel.

Non-compliance wit the provisions of this Clause shall amount to breach of warranty for the consequences of which the Charterers shall be liable and shall hold the Owners, the Master and the crew of the vessel harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them individually or jointly. Furthermore, all time lost and all expenses incurred, including fines, as a result of the Charterers' breach of the provisions of this Clause shall be for the Charterers' account and the vessel shall remain on-hire.

Should the vessel by arrested as a result of the Charterers' non-compliance with the provisions of this Clause, the Charterers shall, at their expense, take all reasonable steps to secure that within a reasonable time the vessel is released and at their expense but up bail to secure release of the vessel.

- 11 -

M/V " DIMITRIS APESAKIS " - C/P DATED 30.10.2007

The Owners shall remain responsible for all time lost and all expenses incurred, including fines, in the event that unmanifested narcotic drugs and/or marijuana are found in the possession or effects of the vessel's personnel.

b)      In pursuant of the provisions of sub-Clause a) above, the Owners and the Charterers warrant that they shall both becomes signatories to the Sea Carrier Initiative Agreement on signing this Charter Party or on delivery of the vessel under this Charter, whichever is the earlier, and will so remain during the currency of the Charter.

c)      The costs of any precautionary surveys undertaken in order to search for illegal substances on or about the vessel shall be apportioned equally between the Owners and the Charterers. If survey or underwater inspection is compulsory then same to be for Charterers' account.

### Clause 83
Crew to perform first opening and last closing at both loading and discharging ports, crew to assist at other time local regulations permitting.

### Clause 84
### Lightening Clause
The Charterers shall have the right, where and when it is customary and safe for vessels or similar type to do so, order the vessel to go, lie or remain alongside a lightening vessel / craft, or to order such vessels to come and remain alongside at such safe dock whart anchorage or other place for loading or discharging of cargo always within port limits. The Charterers shall provide sufficient fenders to enable the operations to be completed safely. Owners / vessel to allow Charterers the free use of fender equipment as on board.

If at any time the Master of the " DIMITRIS APESAKIS " considers it unsafe for lightening vessel/craft and/or his own vessel he may order such vessels away from his ship. In case of any additional Hull and Machinery insurance premiums applicable during this operation Charterers to reimburse Owners for net amount as per vouchers, with the next hire payment due after receipt at same. Provided same supported by insurance company vouchers and same not to exceed of Lloyd's of London.

All such lighterage operations and any additional cost to be arranged and contracted for by Charterers at their expense and responsibility and to Master's satisfaction.

### Clause 85
### Ice Clause
The vessel not to be ordered to nor bound to either any ice-bound place where lights, lightships, marks and buoys are or likely to be withdrawn by reason of ice on the vessel's arrival where there is a risk that ordinarily the vessel will not be able to reach the place or get out after having completed loading or discharging. The vessel not to be obligated to force ice or to follow ice-breakers when inwards bound. If on account of ice the Master considers it dangerous to remain at the loading or discharging place for fear of the vessel being frozen and/or damaged, he has the liberty to sail to a convenient open place and await the Charterers' fresh instructions. Detention through any of the above causes, to be for Charterers' account.

### Clause 86
### Soft Loading Clause
Proper strapping and dunnage to be applied in the holds for the steels loading cargo. The Charterers shall instruct the terminal operators or their servants to load the cargo, in accordance with Annex 9 of the IMO Code of Safe Practice for Cargo Stowage and

- 12 -

M/V " DIMITRIS APESAKIS " - C/P DATED 30.10.2007

Securing. The first layer of steels reaching up to 2 meters from the tank top shall be loaded softly so as to provide a proper cushion. In the event that the Charterers, the terminal operators or their servants do not comply with the above provisions, then master to have option to stop loading and any loss of time to be for Charterers account and vessel to be in full hire during such stoppage, also the costs of any damage caused to the vessel as a result thereof and any time spent repairing such damage shall be for Charterers' account. Charterers shall at their time and expense arrange holds survey before loading and after discharging to ascertain damages to the holds for which Charterers to be responsible

### Clause 87
Should the vessel be arrested during the currency of this Charter Party at the suit of any person having or purporting to have a claim against or any interest in the vessel, hire under this Charter Party shall not be payable in respect of any period whilst the vessel remaining under arrest or remains unemployed as the result of such arrest and the Owners shall reimburse to the Charterers any expenditure which they may incur under this Charter Party in respect of any period during which, by virtue of the operation of the Clause, no hire is payable. This Clause shall be inoperative should the arrest be caused through act or omission of the Charterers.

### Clause 88
That in the event of loss of time from deficiency and/or default of men or stores, fire, breakdown or damages to hull machinery or equipment, grounding detention by average accidents or ship or cargo, dry-docking for the purpose of examination of painting bottom, or any other cause preventing the full working of the vessel, the payment of hire shall cease for the time hereby lost until the vessel is in efficiency and has returned to the same or equivalent position.

### Clause 89
Charterers not to knowingly trade the vessel to areas where as a result she may be boycotted as a result in the future.

### Clause 90
### Double Banking Clause : (Bimco)
A)    The Charterers shall have the right, where and when it is customary and safe for vessel's of similar size and type to do so, to order the Vessel to go, lie or remain alongside another vessel or vessels of any size or description whatsoever or to order such vessels to come and remain alongside at such safe dock, wharf, anchorage or other place for transshipment, loading or discharging of cargo and/or bunkering.

B)    The Charterers shall pay for and provide such assistance and equipment as may be required to enable any of the operations mentioned in this clause safely to be completed and shall give the Owners such advance notice as they reasonably can of the details or any such operations.

C)    Without prejudice to the generality of the Charterers' right under (A) and (B) it is expressly agreed that the Master shall have the right to refuse to allow the vessel to perform as provided in (A) and (B) if in his reasonable opinion it is not safe so to do.

D)    The Owners shall be entitled to insure any deductible under the Vessel's hull policy and the Charterers shall reimburse the Owners any additional premium (s) required by the Vessel's Underwriters and/or the cost of insuring any deductible under the Vessel's hull policy.

- 13 -

M/V " DIMITRIS APESAKIS " - C/P DATED 30.10.2007

E)     The Charterers shall further indemnify the Owners for any costs, damage and liabilities resulting from such operation. The Vessel shall remain on hire for any time lost including periods for repairs as a result of such operation.

## Clause 91
### Bill of Lading Identifier Clause
Accompanying a shipment of cargo destined to a port or place in the U.S.A. shall be endorsed with a unique Bill of Lading Section 47A including subsequent changes, amendments or modifications hereto, not later than the first port of call. Non-compliance with the provision of this Clause shall amount to breach of warranty for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them. Furthermore, all time lost and all expenses incurred including fines as a result of the Charterers' breach of the provision of this Clause shall be for Charterers' account.

## Clause 92
Owners warrant during the currency of this Charter vessel will comply with the regulations of the countries in which the vessel can be employed under this Charter Party (including ILC Convention, Part number as well as U.S. Public Law 85/742, Part 9 Safety and Health Regulation for Longshoring) vessel to be in possession of valid certificates to comply with these regulations. In the event of stevedores, longshoremen or other workmen are not permitted to work due to failure of Master / Owners shall pay all expenses to rectify situation. Hire shall cease until vessel able to comply with said regulations.

## Clause 93
The Master shall perform the voyages with due despatch, and shall render all customary assistance with the vessel's crew. The Master shall be conversant with the English language and (although appointed by the Owners) shall be under the orders and directions of the Charterers as regards employment and agency, and the Charterers shall perform all cargo handling, including but not limited to loading, stowing, trimming, lashing, securing dunnaging, unlashing, discharging and tallying at their risk and expense, under the supervision of the Master.

## Clause 94
Unless otherwise agreed, the Charterers shall have the liberty to sublet the vessel for any part of the time covered by this Charter Party, but the Charterers remain responsible for the fulfilment of this Charter Party.

## Clause 95
The Charterers shall endeavour to supply bunkers which conform to the specification(s) provided by Owners, if the vessel's trade does not result in uniformity with above Charterers and Owners to agree to specification prior supply.

## Clause 96
### Split Bills of Lading Clause for Discharge North Continent
Owners / Master to authorise Charterers and/or their Agents if requested to do so, to split Bill(s) of Lading and issue ship's delivery orders against the collection of full set of original Bill(s) of Lading. Delivery orders to confirm with all terms and conditions and exceptions of Bill(s) of Lading and shall not prejudice ShipOwners' rights.

- 14 -

**M/V " DIMITRIS APESAKIS " - C/P DATED 30.10.2007**

Owners are not responsible for out-turn figures or any claims rotated to such splitting of Bill(s) of Lading. Any additional costs relating to the splitting of Bill(s) of Lading and issue of such delivery orders, including specialist survey fees are to be for Charterers' sole account.

## Clause 97
### War Risk Clause
Basic annual War Risk cover and crew War Risk bonus to Master and crew to be for Owners' account. Any extra and/or additional war risk insurance premium imposed by the Owners' Underwriters due to the trading of the vessel to or through areas, including Suez cover, for which extra and/or additional crew war risk bonus as required by Owners, to be for Charterers' sole account and to be paid for upon presentation of original vouchers. Any amount for all such premiums are not to exceed that quoted at the time by Owners' Underwriter's Hellenic War Risks Club.

## Clause 98
### BIMCO I.S.M. Clause
From the date of coming into force of the International Safety Management (I.S.M.) Code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and "the Company" (as defined by the I.S.M. Code) shall comply with the requirements of the I.S.M. Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (D.O.C.) and Safety Management Certificate (S.M.C.) to the Charterers.

Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by failure on the part of the Owners or "the Company" to comply with the I.S.M. Code shall be for the Owners' account.

## Clause 99
### Steel Preloading Survey
The Owners to have the privilege to appoint a P. and I. Surveyor to conduct a steel preloading survey. Expenses of such survey including surveyors fees to be equally shared between Owners and Charterers.

## Clause 100
### Intermediate Hold Cleaning Clause
On completion of discharge each cargo, vessel's crew shall render customary assistance in cleaning cargo holds in preparation for next cargo, if required by Charterers and if not prevented by shore regulations. Such cleaning to be performed while vessel is enroute to next load port provided that this can be safely done, weather permitting and that the duration of the voyage is sufficient.

Charterers shall pay U.S.$ 600.- per hold used in case of Grains and U.S.$ 800.- per hold used in case of other products, such cleaning will be done as best as possible as if vessel was trading for own account but without guarantee that cargo holds will be sufficiently cleaned and accepted on arrival at loading port however in case vessel fails crew to clean again without further payment.

Owners shall not be responsible for any consequences arising from the fact that the vessel's crew has been employed in cleaning. All fresh water consumption to be for Charterers' account. Charterers not to negotiate with crew. In case vessel redeliver in a country where cargo holds cleaning not permitted done by crew, same to be carried out by Charterers at their time and expense. Notwithstanding any of the above it is clearly understood that Owners have a responsibility to maintain the vessel's holds and hatches in good condition during the course of this Charter Party.

M/V " DIMITRIS APESAKIS " - C/P DATED 30.10.2007

Clause 101
Prolonged Port Stay
If the vessel's performance is adversely affected as a result of bottom fouling by reason
of the vessel being at anchor or in port for more than twenty five (25) days then Owners
shall not be responsible for any under-performance of the vessel and Charterers shall not
claim against Owners in this respect. Owners are to provide Charterers with evidence
that the sole contributory cause of such under-performance is detention as described
hereinbefore and nothing else, by the inspection of the vessel's underwater hull area and
cleaning if necessary at first available opportunity at Charterers' time, risk and expense.

Clause 102
Ballast Desinfection
Any detergent/disinfectant required by authorities to be added to ballast water prior to
ballasting/ deballasting tanks or hold spaces within National Territorial Waters of
respective countries to be supplied by Charterers at their risk, time and expense.

Clause 103
U.S. Security Clause for Time Chartering
If the vessel calls in the United States, including any U.S. territory, the following
provisions shall apply with respect to any applicable security regulations or measures:

Notwithstanding anything else contained in the Charter Party all costs or expenses
arising out of or related to security regulations or measures required by any U.S.
authority including, but not limited to, security guards, launch services, tug escorts, port
security fees or taxes and inspections, shall be for the Charterers' account, unless such
costs or expenses result solely from the Owners' negligence.

Clause 104
ISPS/MTSA Clause For Time Charter Parties 2005

(a)     (i) The Owners shall comply with the requirements of the International code for
        the security of ships and of port facilities and the relevant amendments to
        Chapter XI of Solas (ISPS Code) relating to the vessel and the company (as
        defined by the ISPS Code). If trading to or from the United States or passing
        through United States waters, the Owners shall also comply with the
        requirements of the US Maritime Transportation Security Act 2002 (MTSA)
        relating to the vessel and the Owner (as defined by the MTSA).

        (ii) Upon request the Owners shall provide the Charterers with a copy of the
        relevant International Ship Security Certificate (or the Interim International Ship
        Security Certificate) and the full style contact details of the company security
        officer (CSO).

        (iii) Loss, damages, expense or delay (excluding consequential loss, damages,
        expense or delay) caused by failure on the part of the Owners or the company /
        Owner to comply with the requirements of the ISPS Code / MTSA or this Clause
        shall be for the Owners account, except as otherwise provided in this Charter
        Party.

(b)     (i) The Charterers shall provide the Owners and the Master with their full style
        contact details and, upon request, any other information the Owners require to
        comply with the ISPS Code / MTSA.

M/V " DIMITRIS APESAKIS " - C/P DATED 30.10.2007

Where sub-letting is permitted under the terms of this Charter Party, the Charterers shall ensure that the contact details of all sub-Charterers are likewise provided to the Owners and the Master.

Furthermore, the Charterers shall ensure that all sub-Charter Parties they enter into during the period of this Charter Party contain the following provision :

"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the Owners."

(ii) loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.

(c)    Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code / MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew. All measures required by the Owners to comply with the ship security plan shall be for the Owners' account.

(d)    If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

**Clause 105**
**BIMCO U.S. Customs Advance Notification/AMS Clause for Time Charter Parties**

a)    If the vessel loads or carries cargo destined for the U.S. or passing through U.S. ports in transit, the Charterers shall comply with the current U.S. Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

Have in place a SCAC (Standard Carrier Alpha Code);
Have in place an ICB (International Carrier Bond);
Provide the Owners with a timely confirmation of i) and ii) above; and
Submit a cargo declaration by AMS (Automated Manifest System) to the U.S. Customs and provide the Owners at the same time with a copy thereof.

b)    The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-Clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the vessel shall remain on-hire.

c)    If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

- 17 -

M/V " DIMITRIS APESAKIS " - C/P DATED 30.10.2007

d)     The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the U.S. Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any Bill of Lading, other contract, law or regulation.

## Clause 106
### Lime Coating/Hold Block Clause
Lime coating and/or hold block of holds if needed by Charterers, Shippers or Owners shall be arranged by Charterers at their risk, time and cost including the cost of lime equipment. Similarly the time and cost of lime coating and/or hold block removal shall be for Charterers account.

## Clause 107
### Dry Dock Clause
No dry-dock during the currency of this Charter-Party except in case of emergency.

## Clause 108
### Bimco Bunker Fuel Sulphur Content Clause For Time Charter Parties 2005

A)     Without prejudice to anything else contained in this Charter Party, the Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the vessel is ordered to trade within that zone. The Charterers also warrant that any bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes.

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Sub-clause(a).

B)     Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-Clause (a), the Owners warrant that:

(i) the Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zone; and

(ii) the Vessel shall be able to consume fuels of the required sulphur content when ordered by the Charterers to trade within any such zone. Subject to having supplied the vessel with fuels in accordance with Sub-clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the vessel's failure to comply with Regulations 14 and 18 of MARPOL Annex VI.

C)     For the purpose of this Clause, 'emission control zone' shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency."

## Clause 109
### Change of Ownership
During the currency of this Time-Charter vessel can change Ownership and/or Management after written request to Charterers whose agreement not to be unreasonably withheld and under understanding that the new Owners and/or Managers

M/V " DIMITRIS APESAKIS " - C/P DATED 30.10.2007

shall take over the remaining of this Time-Charter under the terms and conditions of governing Charter-Party.

**Clause 110**
No deck cargo is allowed.

**Clause 111**
Negotiations and fixture to be kept strictly Private and Confidential.

* * * * * e n d * * * * *

## BOTH TO BLAME COLLISION CLAUSE

If the liability for any collision in which the vessel is involved while performing this Charter Party falls to be determined in accordance with the laws of the United States of America, the following Clause shall apply: -

## BOTH TO BLAME COLLISION CLAUSE

If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the Owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her Owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the Owners of the said goods, paid or payable by the other or non-carrying ship or her Owners to the Owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the Owners, Operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact.

And the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same Clause.

## GENERAL AVERAGE AND THE NEW JASON CLAUSE

General Average shall be payable according to the York/Antwerp Rules, 1974, but where the adjustment is made in accordance with the law and practice of the United States of America, the following Clause shall apply:-

## NEW JASON CLAUSE

In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract or otherwise, the goods, shippers, consignees or Owners of the goods, shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required be made by the goods, shippers, consignees or Owners of the goods to the carrier before delivery.

And the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same Clause.

## BIMCO STANDARD WAR RISK CLAUSE FOR TIME CHARTERS, 1993
## CODE NAME: "CONWARTIME 1993"

1)      For the purpose of this Clause, the words:

        a) 'Owners' shall include the shipOwners, bareboat charterers, disponent Owners, managers or other operators who are charged with the management of the vessel, and the Master; and

b) 'War Risks' shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or Ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the vessel, her cargo, crew or other persons on board the vessel.

2)   The vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea); or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks.  Should the vessel be within any such place as aforesaid, which only become dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

3)   The vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessel of certain flags or Ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerent right of search and/or confiscation.

4    a) The Owners may effect war risks insurance in respect of Hull and Machinery of the vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their Protection and Indemnity Risks), and the premiums and/or calls thereof shall be for their account.

     b) If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the vessel is within, or is due to enter and remain within, any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then such premiums and/or calls shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due.

5)   If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then such bonus or additional wages shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due.

6)   The Vessel shall have liberty:-

     a) To comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

     b) To comply with the order, directions or recommendations of any war risk underwriters who have the authority to give the same under the terms of the war risk insurance;

     c) To comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

d) To divert and discharge at any other port any cargo or part thereof which may render the vessel liable to confiscation as a contraband carrier;

e) To divert and call at any other port to change the crew or any part thereof or other persons on board the vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

7)   If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or anyone or more of them, they shall immediately inform the Charterers.   No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterer within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

8)   If in compliance with any of the provisions of sub-Clauses 2) to 7) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

## P & I CLUBS OIL BUNKERING DEVIATION CLAUSE

The vessel in addition to all other liberties shall have liberty as part of the contract voyage and at any stage thereof to proceed to any port or ports whatsoever, whether such ports are on or off the direct and/or customary route or routes to the ports of loading or discharge named in this Charter and there take oil bunkers in any quantity in the discretion of Owners even to the full capacity of fuel tanks, deeptanks and any other compartment in which oil can be carried, whether such amount is or is not required for the chartered voyage.

## ADDITION TO ARBITRATION CLAUSE

All disputes arising out of this Contract shall be arbitrated in London where the amount in dispute does not exceed U.S.$ 75,000 under the "Small Claims Procedure" of the London Maritime Arbitrator's Association (L.M.A.A.), it is hereby agreed between Owners and Charterers that they will refer such dispute to a single Arbitrator in London in accordance with the L.M.A.A. Small Claims Procedure 1989.

The Arbitrators shall be commercial persons conversant with shipping matters and engaged in day to day chartering and/or vessel operations. Any claim must be made in writing and Claimant's Arbitrator appointed or proposed within 12 (twelve) months of final discharge and where this provision is not complied with, the claim shall be deemed to be waived and absolutely barred.

If either of the arbitrators, refuses to act, or is incapable of acting, or dies, the party who appointed him may appoint a new arbitrator in his place. If one party fails to appoint an arbitrator, either originally or by way of substitution as aforesaid, with 7 (seven) clear days after the other party having appointed that arbitrator to act as sole arbitrator in the reference and his award shall be binding on both parties as if he had been appointed by consent. If the two arbitrators fail to agree upon an umpire, the presidency of the London Maritime Arbitrator's Association to nominate an Umpire. Arbitrators to be commercial shipping men.

## CLAUSE PARAMOUNT

All Bills of Lading issued under this Charter shall include the following Clause:

1)    This Bill of Lading shall have effect subject to any national law making the International Convention of the Unification of certain rules of law relating to Bills of Lading signed by Brussels on 25th August, 1924 (the Hague Rules) or the Hague Rules as amended by the protocol signed by Brussels on 23rd February, 1968 (the Hague/Visby Rules) compulsory applicable to this Bill of Lading.  If any terms of this Bill of Lading be repugnant to that legislation to any extent, such terms shall be void to that extent but no further.  Neither the Hague Rules nor the Hague/Visby Rules shall apply to this contract where the goods carried hereunder consist of alive animals or cargo which by this contract is stated as being carried on deck and is so carried.

2)    Deleted.

3)    Where the Hague, Hague/Visby or Hamburg Rules are not compulsorily applicable to this Bill of Lading, the Carrier shall be entitled to the benefits of all privileges, rights and immunities contained in Article 1 to VIII of the Hague Rules, safe that the limitation sum for the purpose of Article IV Rule 5 of the Hague Rules shall be £100 sterling.

*****

# EXHIBIT 2

**IN THE MATTER OF THE ARBITRATION ACT 1996**

**AND**

**IN THE MATTER OF AN ARBITRATION**

B E T W E E N

WE HEREBY CERTIFY THAT THIS IS
A TRUE COPY OF THE ORIGINAL
*[signature]*
HOLMAN FENWICK WILLAN LLP

Claimants:

Bunge SA of Geneva

("the Owners")

*RICHARD DOUGLAS MERRYLEES*

*[signature]*

- and -

*22 SEPTEMBER 2011*

*HOLMAN FENWICK WILLAN LLY*

*FRIARY COURT*

Respondents:

Glory Wealth Shipping Pte Limited of Singapore

*65 CRUTCHED FRIARS*

("the Charterers")

*LONDON*

*EC3N 2AE*

M/V "DIMITRIS APESAKIS"

Charterparty dated 30th October 2007

FINAL ARBITRATION AWARD

2

**IN THE MATTER OF THE ARBITRATION ACT 1996**

**AND**

**IN THE MATTER OF AN ARBITRATION**

B E T W E E N

Claimants:

Bunge SA of Geneva

("the Owners")

- and -

Respondents:

Glory Wealth Shipping Pte Limited of Singapore

("the Charterers")

M/V "DIMITRIS APESAKIS"

Charterparty dated 30th October 2007

FINAL ARBITRATION AWARD

**WHEREAS:**

1.      By a charterparty on the New York Produce Exchange 1946 form incorporating additional terms as agreed on 30th October 2007 ("the Charterparty") the Claimants who were the disponent owners ("the Owners") chartered the m.v. "DIMITRIS APESAKIS" to the Respondents ("the Charterers") for 24 to 25.5 months period time charter.

3

2.    Clauses 17 and the *"ADDITION TO ARBITRATION CLAUSE"* provided for arbitration in London in accordance with English law.

3.    A dispute having arisen, the Owners appointed me, the undersigned Anthony Scott of Creek House, 39 The Lane, West Mersea, Essex as their nominated arbitrator and the Charterers appointed me, Simon Gault of Field Farm, Iden Green, Benenden, Kent as their nominated arbitrator. The parties subsequently agreed that the London Maritime Arbitrators Association ("the LMAA") terms 2006 would apply to the reference. Furthermore, in accordance with the parties' agreement, we appointed Alan Oakley of Hoy's Farm, Upwick, Ware, Hertfordshire as third arbitrator. We are all Full Members of the LMAA. The seat of the arbitration is in England.

4.    This dispute arose between the parties because the Charterers redelivered the vessel early. The Owners claimed damages in the sum of US$26,626,125 (net contractual rate less net market rate for 555 days), or alternatively US$22,763,053 (net contractual rate less actual rate for 510 days plus net contractual rate less net market rate for 45 days) or alternatively US$21,164,659 (net contractual rate less actual rate for 510 days plus net contractual rate less hire payable to the head owners for 45 days), together with interest and costs. Whilst the Charterers admitted liability, they claimed that the Owners' damages were limited to US$10,601,852.62 (net contractual rate less net foreseeable worst market rate for 555 days less actual earnings for 509 days) or US$ 21,153,777.64 (net contractual rate less actual earnings for 509 days) or US $21,509,479.90 (net contractual rate less actual earnings for 509 days plus loss of profit for 45 days).

4

However, the Charterers failed to pay any sum to the Owners by way of damages.

5.   An oral hearing took place at the International Dispute Resolution Centre in London on 20th April 2011. The Owners were represented by Mr Charles Kimmins QC of 20 Essex Court and the Charterers by Mr Robert Joiner from the firm of Kennedys, Singapore. Expert evidence was given by Mr Simon Everton who was instructed by the Owners and Mr Christopher Lewis who was instructed by the Charterers. Both Experts are experienced and well respected shipbrokers, who have been members of the Baltic Exchange in the City of London for many years.

**(I) The factual background:**

6.   The factual background is not in dispute and can be summarised very simply. The vessel's type is known as a "Kamsarmax" bulk carrier, which is indicative that she has the maximum dimension permissible for trading to Port Kamsar. More specifically, she has a deadweight of 82,190 mt with an LOA of 228.99 meters. She was built in 2008. On 30th October 2007, the Owners fixed the vessel to the Charterers for minimum 24 months to maximum 25.5 months period time charter at US$66,500 per day (less 5% commission). On 28th August 2008, the vessel was delivered to the Charterers. Therefore, the earliest date that the Charterers could lawfully re-deliver the vessel to the Owners was on 28th August 2010. However, on 19th February 2009 (05:54 utc), the Charterers repudiated the Charterparty. Later the same day the Owners accepted the repudiation and the charter was terminated, effectively 554/555 days early.

5

7.    We have not been provided with the exact time of day when delivery took place. Therefore, it is not possible for us to reconcile whether the vessel was redelivered 554 or 555 days early. We have therefore given the Charterers the benefit of the doubt and taken the figure of 554 days, which reconciles with their calculation of 504 days from the date of repudiation to the date of the vessel's physical redelivery to the head owners, i.e. on 13th July 2010 and 45 days thereafter to 28th August, being the earliest date of redelivery under the Charterparty.

8.    The evidence was that the final accounting to 19th February 2009 had been agreed and settled between the parties and that the only outstanding issue was the level of damages to which the Owners were entitled for the vessel's early redelivery.

9.    The issues which arise from this dispute have been identified as follows:

   (i)    was there an available market for a substitute time charter of the vessel for about 18 months period at the date of repudiation and, if so, what was the rate?

   (ii)   if there was an available market, does it follow that damages should be assessed by reference to the available market?

   (iii)  assuming that damages are to be assessed by reference to the available market, what is the correct quantum of the Owners' claim?

   (iv)   assuming that damages are not to be assessed by reference to an available market, what were the losses that the

6

Owners suffered by reason of the Charterers' premature redelivery?

(v)   are the Owners damages to be limited in any event on the grounds that the magnitude of the losses was not foreseeable?

**(II) Was there an available market?**

10.   The reference to an "available market" hereafter refers to the market for an 18th month period time charter for a Kamsarmax type vessel as at, or about, 19th February 2009. The availability of such a period market is central to the calculation of damages.

11.   Following the Charterers' repudiation and the Owners' acceptance of such on 19th February 2009, the Owners adopted the position (as set out in the authority of The *"Elena d'Amico"* [1980] 1 Lloyd's Rep 75) that they were entitled to damages on the basis of the difference between the contract and market rates at the time of the Charterers' repudiation. On 24th February 2009, they submitted a claim to the Charterers for damages of US$27,685,353.71 based on an available market rate of US$16,000 per day.

12.   The Charterers rejected this claim and argued that there was no available market for 18 months period charter for a Kamsarmax and, even if there was an available market, the Owners' losses should be limited to their actual losses based on the eleven spot fixtures which they in fact performed. The Charterers also argued that the Owners' damages should be limited to 62% of the sum claimed because of the magnitude of the fall in the market from late 2008, which was not foreseeable. They also argued that the

7

Owners were only entitled to damages to 13th July 2010, alternatively, they were only entitled to reduced damages between 13th July 2010 and 28th August 2010.

13. The Charterers did, however, accept that there was an available market for up to 13 months' time charter for both Panamax and Kamsarmax type vessels. They also accepted that there was an available 24 month period market available for Panamax type vessels. Furthermore, their Expert, Mr Lewis, appeared (somewhat reluctantly) to concede in cross examination that the period rate applicable for 11-13 months was likely to apply, or thereabouts likely to apply, for a period of 14 months' time charter.

14. Before referring to the Experts' evidence as regards the available market, it is helpful to explain that the Kamsarmax type vessel has a slightly larger deadweight and LOA to that of a modern Panamax type. Notwithstanding these differences, together with differences in such variables as the cubic capacities and consumptions, we accept that the two types of vessel can be compared when assessing their market values. Mr Everton suggested that the market difference between these types of vessel was about 8% in favour of the Kamsarmax, though we do not treat this figure with any degree of accuracy.

15. We were provided with the details of ten period fixtures for Panamax and Kamsarmax type vessels fixed between the end of December 2008 and the beginning of March 2009 for varying periods of about 12 and 24 months. There was no evidence of either type of vessel being fixed for 18 months period. The Owners' evidence was that regardless that there were no reported fixtures for 18 months' period, there was still an available market.

8

The Charterers' argued that in the absence of any evidence that an 18 month period fixture was done at the time, there was no available market on which the Owners could base their calculation for damages.

16. We will deal later in this award with the applicable law and the question of whether the Owners are entitled to claim damages on the basis of the available market. What we are concerned with in this section of the award is simply whether there was an available 18 month period market at the time of repudiation for a Kamsarmax type vessel.

17. The legal test for whether there was an available market test was set out by Upjohn J in *Thompson, Ltd v Robinson (Gunmakers) Ltd [1955] Ch 177*. He held that:

> " 'available market' merely means that the situation in the particular trade in the particular area was such that the particular goods could freely be sold, and that there was sufficient demand to absorb readily all the goods that were thrust on it, so that if a purchaser defaulted the goods in question could readily be disposed of."

18. This test was adopted by Sellers LJ in *A.B.D. (Metals & Waste). Ltd v Anglo Chemical & Orfe Company, Ltd* [1955] 2 LLR 456 at 465. This was also the test adopted by Webster J in *Shearson Lehman Hutton Inc. v Maclaine Watson & Co Ltd.* [1990] 1 Lloyds Rep 441.  He summarised the test in slightly different words as follows:

> "What, in the light of these decisions, is the meaning of "available market"? ... Approached in this way, the answers seems to me to be : that if the seller actually offers the goods for sale there is no available market unless there is one actual buyer on that day at a fair price; and that if there is no actual offer for sale, but only a notional or hypothetical sale for the purposes of s. 50(3), there is no available

9

market unless on that day there are in the market sufficient traders potentially in touch with each other to evidence a market in which the actual or notional seller could if he wished sell the goods; see Lord Justice Sellers in A.B.D. (Metals & Waste) and Charter v. Sullivan sup."

Steel J adopted that test in *The Kildare* [2010] EWHC 903. On the specific facts of that case, he held that in January 2009 there was no market for a 4½ year consecutive voyage charter or time charter for a Capesize bulk carrier trading within the relevant trading limits.

19.   We turn now to consider the evidence in this case. First, it is helpful to understand how the world of chartering operates. Panamax type vessels have been built in various forms, increasing from 60,000 mt deadweight to 75,000 mt deadweight over the past thirty years. Kamsarmax type vessels of about 82,000 mt deadweight are a recent design which has been built in the past 8 or so years. Suffice it to say that these types of vessel operate in a huge sector of the market (as opposed to such types as Capesize and Handymax etcetera), where they effectively operate in the same trades with few exceptions. Indeed, when Mr Lewis was challenged on which trades the Kamsarmax could not compete with the Panamax (apart from the obvious Port Kamsar and Panamax canal trades) he had considerable difficulty in answering the question despite his insistence that the ships could not be compared. We therefore accept that these types of vessels are comparable with one another and, given the size of the market in which they operate, that there is almost always a market for the ships regardless where they are open – meaning that there are invariably ships of these types available  and charterers able to use them.

10

20.    Therefore, to answer the Charterers' point that there needed to be competition amongst traders to create a market, we take the view that such is always the case for these types of vessels regardless whether we are talking about short voyage or time charter business or longer period charters of up to three years. If a charterer is willing to pay high enough or a ship owner is willing to fix low enough, they will almost inevitably find someone to do business with regardless of market conditions. To this extent, we do not consider that the market conditions in February 2009 were so extreme that they undermined this very simple principle of market trading and that there were charterers willing to do period charters for (literally) any duration, albeit at a rate which suited them.

21.    We are therefore satisfied that the tests applied in the authorities referred to above were met even in the market conditions prevailing in February 2009.

22.    Furthermore, we accept that some fixtures in this sector are reported in the market and others are not, often for reasons of confidentiality. However, we do not accept the Charterers' proposition that because a fixture is done "one to one" and not reported in the market that it does not represent the market rate or establish the available market at the time. Charterers and ship owners (especially the ship owners and charterers involved in the ten fixtures to which we were referred) are extremely sophisticated and use market information regardless whether they keep their fixtures confidential. The same applies to whether a vessel is fixed in direct continuation, when the parties will still aim to fix at the market rate.

11

23.    Furthermore, we accept that similar types of vessels are often fixed for comparable period time charters at slightly differing levels, which is evident from the fixtures we were shown. This is because charterers value ships differently, depending on their precise characteristics and their positions and dates. However, this does not detract from the fact that there will be an established market rate for that type of vessel, which will be adjusted depending on local factors – which the market is invariable aware of.

24.    Finally, we also accept that the time charter rates for trip, short time charters and period charters for different types of vessels can be accurately compared where the vessels are of similar dimensions and operate in the same trades – as we have with the Panamax and Kamsarmax type vessels. Again, the market will invariable work on a known differential which ship owners and charterers work around – Mr Everton suggested that it was about +8% in the case of the Kamsarmax versus Panamax type vessels though it is not important in these proceedings whether this figure is accurate.

25.    Therefore, despite no evidence of an 18 month fixture for a Kamsarmax type at the time we do not accept that there was no available market. The reality is that had the Owners marketed the vessel for 18 months' time charter they would undoubtedly have found a charterer to take the vessel, even if only at what might be considered "a distressed rate". As it was, the Owners chose not to test the market. However, had the Owners found that the best rate that they could obtain from a charterer was only US$10,000 per day for 18 months, that would have established the market rate for that period regardless that it was at such a low rate and regardless that only one charterer was willing to pay that level –

12

which undermines the notion that competition is a necessary ingredient to establish an available market. Furthermore, it should be remembered that the burden placed on an injured party to show that they have acted reasonably when mitigating its loss is not that great.

26. In conclusion, we are satisfied that there was an available market for 18 months' time charter for this vessel at the time of the repudiation.

**(III) Should damages be assessed by reference to the available market?**

27. The Owners argued that despite the fact that they had avoided part of their loss by entering into 11 spot charters for a mixture of voyage and time charter trips, their damages should be assessed on the difference between the contractual rate of hire of US $66,500 gross per day, and a market rate of hire of US$16,000 gross per day. This approach, they said, was supported by the authorities, although (to his credit) their counsel conceded that it could lead to an owner recovering substantial damages where on the facts of the case he has suffered no loss.

28. The Charterers argued that we should only compensate the Owners for the loss which they have suffered by rewarding them the difference between the contractual rate of hire and the earnings from the 11 spot charters which they had entered into following the repudiation of the charterparty.

29. These arguments raise an interesting question of law. The Owners relied on a line of authorities which commenced with a dicta of Lord Wrenbury in *Jamal v Moola Dawood* [1916] 1 AC 175, and

13

continued with the decision of the Court of Appeal in *Campbell Mostyn v Barnett Trading* [1954] 1 LLR 65, the decision of Robert Goff J in *The Elena d'Amico* [1980] 1 Lloyds Rep 75, of Bingham LJ in *Kaines v Osterreichische* [1993] 2 Lloyds Rep 1 and Toulson J in *Norden v Andre* [2003] 1 Lloyds Rep 287. We think that the Owners are right in their contention that these cases approach the matter as one of causation and the rationale for these cases is that if an owner chooses not to avail himself of an available market, that is his choice, and the consequences of that choice may not be visited on the contract breaker. This applies not only where giving credit for the market rate would produce lower damages than giving credit for the actual earnings of a vessel, but also where (as in this case) giving credit for the market rate would produce higher damages than giving credit for the actual earnings of a vessel. The Owners said that this result has the merits of simplicity, the suggestion that it produces a windfall for the Owners is misconceived and it is consistent with the authorities.

30.   The Charterers relied on a number of other authorities such as *The "Golden Victory"* [2007] 2 Lloyd's Rep 164 at 173 to support the unexceptional proposition that damages for breach of contract should compensate the victim of the breach for the loss of his contractual bargain and that the *"Claimant is entitled to the benefit, expressed in money, of the contractual rights he has lost, but not to the benefit of more valuable contractual rights than he has lost"*. Relying on the decision of the House of Lords in *Bwllfa and Methyr Dare Steam Collieries (1891) Ltd v Pontypridd Waterworks Co* [1903] AC 426, they said that when assessing damages account should be made of what has actually subsequently happened. They quoted the well-known remark of Lord Bingham in *The "Golden Victory"* at page 12, that *"... where*

14

*the court making an assessment of damages has knowledge of what actually happened it need not speculate about what might have happened, but should base itself on the known facts ... you need not gaze into the crystal ball when you can read the book."*

31. We have reservations about the authorities relied on by the Owners, but we have concluded that they are well established and that we are bound to apply them in this case. We would, however, make the following comments:

> (a)   It seems to us that they can lead to an injustice by compensating the Owners for more than they have lost. As Lord Justice Somervell observed in *Campbell Mostyn v Barnett Trading* [1954] 1 LLR 65 *"In fact the sellers sold ... at a sum in excess of the market price, and therefore, on the face of it suffered no damage. One can understand, in those circumstances, the buyers thinking that that was the end of it and feeling aggrieved if the provisions of the law held them liable to pay a sum in damages"*. However, that did not deter him from holding the buyers liable to pay a sum in damages in circumstances where the sellers had successfully avoided any loss.

> (b)   It seems to us that this result is not only unjust, but difficult to square with the contractual principles referred to in *The "Golden Victory"* which we have set out above. It appears that we are required by the authorities to compensate the Owners for a loss which they have not suffered and that we are required to gaze into the crystal ball to try an assess market rates, when we can read the book of fixtures which the Owners entered into following the repudiation of the charterparty.

15

(c)     It seems to us that it is consistent with the principle that an Owners cannot recover damages which could reasonably have been avoided if credit is given for the market rate when that would result in lower damages than would be the case if credit is given for the Owners' actual earnings. However, it is difficult to see how giving credit for the market rate is consistent with the principle that an Owner cannot recover damages which he has in fact avoided when that would result in higher damages than would be the case if credit is given for the Owners' actual earnings.

(d)     The approach in terms of causation which was adopted by Robert Goff J in *The Elena d'Amico* [1980] 1 Lloyds Rep 75 has been criticised as of "no assistance" and "unhelpful"; see paragraphs 7 – 018 and 7-101 of *McGregor on Damages* (18th Ed).

(e)     If it is correct to approach the question of the measure of Owners damages as a matter of causation, on normal principles that should be a question of fact for the tribunal. These authorities appear to have elevated that question into one of law. If it is treated as a question of fact, the answer to the question may not be the same in every case. In this case, we would have found it difficult to hold as a question of fact that the decision by the Owners to enter into the 11 spot charters was not caused by the Charterers' repudiation of the charter since it was only because of that repudiation that "DIMITRIS APESAKIS" became available to enter into these spot charters. But for that repudiation, the Owners could not have entered into those charters and

16

manifestly did so in order to mitigate the damage caused by it. However, it seems that the authorities cited by the Owners prevent us from making such a finding of fact.

(f)     It seems to us that the attractions of simplicity should not be preferred to the general principle that an Owners should not recover for a loss which he has not suffered.

(g)     However, we are also aware of the possible converse situation where the actual earnings are less than the damage based on the market rate.   In this situation, should the Charterers have paid more damages than those based on the market rate?   However, any risk of market movement, whether up or down, must be at the risk of the party in breach.

32.   However, we accept that there must be an element of finality when it comes to calculating damages in cases where the charterer has chosen to abandon his contractual commitments. Therefore, we can reconcile the decision of The "Elena d'Amico" with our comments in the preceding paragraph. However, the point is brought into sharp relief by the Owners' claim for the damages for the period from 14th July 2010 to 28th August 2010. The Owners accepted that they only lost a profit of US$368,106 (actually US$315,590) for this period but they advanced a claim for US$1,966,500 on the basis of the difference between the contractual and market rates. This is a profit which they would never have made as they were paying the head owners of the vessel a net rate of hire of US$56,161.88 (and not a current market rate) and earning a net rate of hire from the Charterers of US$63,175.

17

33.    Given our findings above, we are satisfied that the Owners are
entitled to damages from 14th July  to 28th August 2010 on the
basis of the market rate regardless that the vessel was not in their
service at the time. By analogy, if the vessel had been fixed on
period time charter at the market rate until 28th August 2010, but
had been lost in (say) April 2009, the Owners would still have
been entitled to damages for the full period from 14th February
2009 to 28th August 2010. This analysis might seem somewhat
unfair to the Charterers given that had the original charter been
maintained, the Owners' profit, as such, would have ended in April
2009. However, the commercial reality would have been that the
Charterers chose to repudiate the charter in February 2009, at
which time they exposed themselves to damages calculable as per
The "Elena d'Amico". If would therefore be very unfair if the
Charterers were then allowed to reduce their liability for damages
in the case of the vessel's subsequent loss when they no longer
had control of the vessel having abandoned their contractual
obligations.   To this extent, although Owners re-delivered the
vessel to the head owners at the first opportunity as they were
still losing money, we are nevertheless sure that the Owners
would have kept the vessel on hire during the period of the 14th
July to 28th August 2010 (as they could have done under the head
charter) as they would have been making a profit on the
difference.   We cannot therefore criticise the Owners for trying to
minimise their own damages in the matter.

34.    We turn now to consider the other issues which arise.

18

### (IV) Assuming that damages are to be assessed by reference to the available market, what is the correct quantum of the Owners' claim?

35. The question arises as to the applicable rate. However, period rates in this sector are not an exact science since, as we have said, the value of a ship (even for period charter) will differ depending on its characteristics and when and where it is open: the evidence of the fixture of the Panamax "CLIO" for 11-14 months basis delivery PMO, where Cargill only paid US$6,000 daily for the first 30 days, and US$11,000 thereafter, is good evidence of this.

36. In this case we have the benefit of knowing the details of ten fixtures, six of which were for Panamax vessels and four for Kamsarmax vessels. The details of these fixtures were set out in the evidence and it is not necessary for us to recite those details here. However, what emerges from these fixtures is that whereas Panamax vessels were being fixed for 12 months' time charter at about US$12,000 per day, Kamsarmax vessels were, in the main, being fixed for the same period at between US$15,500 and 16,500 per day, though there was one fixture (of the "YASA NESLIHAN") at US$18,500 per day. However, the Charterers did not suggest that we should look at this fixture in isolation when determining the 12 month bench mark rate for the Kamsarmax type. Therefore, we have assumed that the charterers paid this vessel a premium for her position and/or place of delivery and we have taken the market rate for a Kamsarmax type for 12 month time charter of US$16,000, being the average of the other period fixtures. We also know that Panamax vessels were being fixed for

19

24 months' time charter at about US$13,000 per day, i.e. 8.33% higher than the 12 month rate. Therefore, on the premise that these types of vessel are comparable, it is reasonable to assume (regardless whether any such fixtures were concluded or reported at the time) that the rate for the Kamsarmax for 24 months' time charter would have been about US$17,350 (US$16,000 x 108.33%). It therefore follows as a matter of deduction that the rate for an 18 months' charter for a Kamsarmax lies somewhere between US$16,000 and US$17,350 daily. We have therefore taken the middle figure of US$16,675 per day as being the market rate for a Kamsarmax for 18 months' time charter, which is slightly higher than the figure of US$16,000 mentioned by Mr Everton.

37.  We therefore find that there was an available market for the vessel and that the Owners should use the gross rate of US$16,675 per day, less 5% commission, when calculating damages.

38.  In summary, we find that:

i.  there was an available market of 18 months' time charter had the Owners chosen to fix the vessel for such at the time of the repudiation; and

ii.  the available market (for the purpose of calculating damages) was US$16,675 daily (net US$15,841.25 net basis 5% commission).

20

**(V)   Assuming that damages are not to be assessed by reference to an available market, what were the losses that the Owners suffered by reason of the Charterers' premature redelivery?**

39.   This question does not arise on the basis of our conclusions on issues (II and III). However since it has been argued, we set out our conclusions on this issue. If it had arisen, we would have found that the Owners' damages were US$21,048,967.62 being the difference between what they would have earned for the contractual period US $32,156,075 (US$63,175 [US$66,500 less 5% commission] x 509 days) less what they in fact earned for period 19th February 2009 to 13th July 2010 (i.e. US$11,422,697.38) plus their loss of profit for the period 14th July 2010 to 28th August 2010 (i.e. the difference between the rate of hire of US$56,161.88 [gross hire US$58,350 less 3.75 address commission payable to charterers] payable under the head charter and the net rate of hire of US$63,175 receivable under the sub charter party) x 45 days, namely US$315,590.

40.   Since the Owners chose to redeliver the vessel to the head owners on 13th July 2010, the Charterers argued that they were only entitled to damages to this date. Alternatively, they argued that the Owners were only entitled to the difference between the head charter rate and the Charterparty rate: see *Weir v Dobell* [1916] 1 KB 722.

41.   However, we have dealt with this in paragraph 33 above and found that the Owners are entitled to damages based on the market rate through to 28th August 2010.

21

**(V)   Are the Owners' damages to be limited in any event on the grounds that the magnitude of the losses was not foreseeable?**

42.   The Charterers argued that the Owners' damages should be limited to 62% of the sum claimed because the magnitude of the fall in the market was not foreseeable. They relied on the Court of Appeal's decision in *Victoria Laundry (Windsor) LD v Newman Industries LD* [1949] 2 KB 528 and the case of *The "FORUM CRAFTSMAN"* [1991] 1 Lloyd's Rep. 81. The Charterers also relied upon the decision of the House of Lords in The *"ACHILLEAS"* [2009] 1 AC 426.

43.   The Owners argued that the Charterers' argument was hopeless. They said that it is only the type of loss that needs to be foreseeable, not the extent of the loss. They relied on *Wroth v Tyler* [1974] Ch 30 and *Brown v KMR Services* [1995] 2 Lloyd's Rep 513. The pointed out that the Charterers had run precisely the same argument before Cooke J in *Classic Maritime v Lion Diversified* [2010] 1 Lloyds Rep 59. In that case the Charterers also relied on the decision in *The "Achilleas"* and argued that because of the extreme volatility of the freight market in late 2008 that the Charterers could not be liable for the full extent of the loss claimed by Owners which reflected the full 95 per cent fall in freight rates, but only for the loss flowing from a fall in freight rates for vessels of the kind in question, of the magnitude which the parties would have contemplated, at the time of contracting, as being likely to occur in the ordinary course of things. They commented that Cooke J. had given this argument short shrift. He found that the case raised "the classic distinction, raised in numerous prior authorities, between the

22

type of loss and extent of loss". It made no difference whether or not the extent of the loss was foreseeable. They said that his conclusion applies equally to this case and is a complete answer to Charterers' argument.

44.   We agree with the Owners and think they are correct in their submission that they are entitled to recover their damages in full, provided they can show that the type of loss was within the contemplation of the parties when they entered into the Charterparty. It matters not that when they entered into the Charterparty, they did not contemplate the extent of the subsequent collapse of market rates which caused them to repudiate the Charterparty.

45.   We think that the Charterers' argument is flawed since Mr Lewis's evidence was that the market had been extremely volatile from 2003. Such volatility should clearly have been a warning to the Charterers that although a shortage of ships resulted in very high freight rates, a change in the balance of ships versus cargoes would result in significant falls in freight rates generally. Indeed, history tells us that when bull markets do collapse, they do so with considerable speed to often unprecedented lows – which in the case of shipping can be virtually to virtually zero time charter. This analysis might appear somewhat dramatic to the non-shipping man. However, for those of us who have been working in this industry for the past forty years of so, we know all too well that such extremes are not only possible, but are almost inevitable when a bull market (such as we had through to 2008) collapses.

46.   We therefore have no hesitation in rejecting the Charterers' proposition that the Owners should be restricted to 62% of their

23

claim. The Charterers' are experienced operators who took a business decision which proved to be a mistake, albeit for economic reasons which they did not anticipate. However, they could have hedged their exposure to this charter by taking a lucrative voyage contract (such as for coal or iron ore) or by selling forward FFA contracts for the duration of the charter, thus limiting their financial exposure regardless how far the market fell. The fact that the financial crisis of 2008 was as severe as it was does not detract from the fact that the Charterers made a commercial decision which ultimately proved to be a bad decision when taken in isolation.

## (VI) Quantum:

47.   We have therefore calculated damages as follows:

Period: 19th February 2009 to 28th August 2010 (554 days)

- hire (US$66,500 less 5%)        $63,175.00
- market rate (US$16,675 less 5%) $15,841.25
- difference                       $47,333.75

- US$47,333.75 x 554 days                    US$26,222,897.50

48.   We have therefore awarded the Owners the sum of US$26,222,897.50 by way of damages.

24

### (V) Interest:

49.    Since hire would have been paid over the balance period, we consider that the appropriate order for interest is that it should only be calculated at a commercial rate on the sum of US$26,222,897.50 from 23rd November 2009, being the middle date between 19th February 2009 and 28th August 2010.

### (VI) Costs:

50.    In accordance with the normal rule that costs follow the event, the Charterers shall pay the Owners' recoverable costs, together with our costs.

**NOW WE**, the said Anthony Scott, Simon Gault and Alan Oakley, having taken upon ourselves the burden of this reference and having carefully and conscientiously considered the submissions and evidence both documentary and oral) put before us by the parties **DO HEREBY MAKE, ISSUE AND PUBLISH**   this our **FINAL ARBITRATION AWARD** as follows

**WE FIND AND HOLD** that the Owners' claim succeeds in the sum of US$26,222,897.50 and no more.

25

**WE THEREFORE AWARD AND DIRECT** that:

A)  the Charterers shall forthwith pay to the Owners the sum of US$26,222,897.50 (twenty-six million, two hundred and twenty-two thousand, eight hundred and ninety-seven United States dollars and fifty cents), together with interest payable at the rate of 5% per annum compounded at three-monthly rests from 23rd November 2009, until the date of payment;

B)  the Charterers shall bear their own and the Owners' recoverable costs of this Final Arbitration Award, the latter of which shall, unless agreed, be assessed on the standard basis by the English High Court or, in the Owners' option, by us in an Award on Costs, for which purpose we hereby reserve our jurisdiction;

C)  the Charterers shall also bear the costs of this Final Arbitration Award in the sum of £35,510 provided that if, in the first instance, the Owners shall have paid any amount in respect of such costs, they shall be entitled to an immediate reimbursement of that amount from the Charterers; and

D)  the Charterers shall also pay interest on the Owners' costs awarded in paragraph B above and on any sum paid by the Owners in respect of the costs of this Final Arbitration Award set out in paragraph C above at the rate of 5.5% per annum compounded at three-monthly rests from the date hereof in the case of the Owners' costs and from the date of payment to us in respect of the costs of this award, in both cases until payment or reimbursement as appropriate of such sum by the Respondents.

26

Given under our hands in London this 26th day of May 2011

Anthony Scott

Witness

Simon Gault

Witness

Alan Oakley

Witness

27

**IN THE MATTER OF THE ARBITRATION ACT 1996**

**AND**

**IN THE MATTER OF AN ARBITRATION**

B E T W E E N

Claimants

Bunge SA of Geneva

("the Owners")

- and -

Respondents

Glory Wealth Shipping Pte Limited of Singapore

("the Charterers")

M/V "DIMITRIS APESAKIS"

Charterparty dated 30th October 2007

FINAL ARBITRATION AWARD